LINA TERZIAN, D.O.,

Plaintiff,

v.

MONTCLAIR HOSPITAL, LLC
d/b/a HACKENSACK MERIDIAN
MOUNTAINSIDE
MEDICAL CENTER,

Defendant.

Case No.  2:22-cv-04396

Judge Esther Salas
Magistrate Judge Edward S. Kiel

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION, BY WAY OF AN ORDER TO SHOW CAUSE, FOR A TEMPORARY
<u>RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………………………………………………………...iii

INTRODUCTION .....................................................................................................................1

STATEMENT OF FACTS AND PROCEDURAL BACKGROUND…………………………2

    A. Dr. Terzian's Background……………………………………………………………...2

    B. Dr. Terzian Experiences Discrimination at Mountainside…………………………..4

    C.  Dr. Berg Attempts to Force Dr. Terzian to Resign……………………………………9

    D. Mountainside Denies Dr. Terzian a Fair Appeals Procedure…………………………10

ARGUMENT .........................................................................................................................11

    A.  The Applicable Legal Standard……………………………………………………...11

    B. Dr. Terzian will be Irreparably Harmed Prior to a Resolution on the Merits Absent an

    Injunction Ordered by the Court…………………………………………………………...12

    C. Dr. Terzian has a Reasonable Probability of Success on the Merits of Her LAD

    Claim……………………………………………………………………………………..13

    D. Dr. Terzian Has a Reasonable Probability of Success on Her Due Process Claim…..15

    E. Mountainside Would Not Be Unduly Harmed by Granting the Requested Relief…...17

    F. The Public Interest Would Be Served by the Issuance of an Injunction……………...18

CONCLUSION .....................................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Commonwealth v. Rizzo*,
  Civil Action No. 74-258., 1974 U.S. Dist. LEXIS 7442, (E.D. Pa. July 26, 1974) ................18

*Continental Group, Inc. v. Amoco Chems. Corp.*,
  614 F.2d 351, (3d Cir. 1980) .........................................................................................12

*D.M. v. N.J. Dep't of Educ.*,
  2014 U.S. Dist. LEXIS 119876, (D.N.J. Aug. 28, 2014) ..........................................12

*Doe v. Pa. State Univ.*,
  276 F. Supp. 3d 300 (M.D. Pa. 2017).............................................................12, 18

*Doe v. Rensselaer Polytechnic Inst.*,
  2020 U.S. Dist. LEXIS 191676, (N.D.N.Y. Oct. 16, 2020) ......................................13

*Doe v. Univ. of Cincinnati*,
  872 F.3d (6th Cir. 2017) ....................................................................................17, 18

*Doe v. Univ. of Notre Dame*,
  2017 U.S. Dist. LEXIS 69645 (N.D. Ind. May 8, 2017).........................................16

*Doe v. Weill Cornell Med. Coll. of Cornell Univ.*,
  No. 16-CV-3531 (WHP), 2016 U.S. Dist. LEXIS 75238, (S.D.N.Y. June 8, 2016) ...............16

*Fenje v. Feld*,
  2002 U.S. Dist. LEXIS 9492, (N.D. Ill. May 28, 2002).........................................13

*Grudzinski v. Medical College of Ohio*,
  2000 Ohio App. LEXIS 1622, (Ohio Ct. App. Apr. 12, 2000) .................................16

*Hernandez v. Overlook Hospital*,
  149 N.J. 68 (1997) ..............................................................................................15,18

*Hornstine v. Twp. of Moorestown*,
  263 F. Supp. 2d 887, (D.N.J. 2003)......................................................................18

*Maresca v. Port Auth. of NY & NJ*,
  2012 U.S. Dist. LEXIS 182484, (D.N.J. Dec. 27, 2012).........................................14

*Ramsay v. Nat'l Bd. of Med. Exam'rs,*
    968 F.3d, (3d Cir. 2020) ...................................................................................................13, 18

*Roe v. Adams-Gaston*,
    No. 2:17-cv-945, 2018 U.S. Dist. LEXIS 185697, S.D. Ohio Apr. 17, 2018) ..........................17

*Punnett v. Carter*,
    621 F.2d, (3d Cir.1980) ............................................................................................................13

*Viscik v. Fowler Equipment Co.*,
    173 N.J. 1, 800 A.2d (N.J. 2002)..............................................................................................13

*Williams v. Pemberton Tp. Public Schools*,
    323 N.J. Super. (Super. Ct. App. Div. 1999)............................................................................13

## **INTRODUCTION**

Plaintiff Lina Terzian, D.O. ("Dr. Terzian"), was a first-year resident in the family medicine residency program at Defendant Montclair Hospital, LLC D/B/A Hackensack Meridian Mountainside Medical Center ("Mountainside").

Dr. Terzian is 57 years old. She was a physician in her native country of Syria before emigrating to the United States in 2002.

After efforts over many years to gain acceptance to a U.S. residency program, which is a prerequisite for practicing medicine in this country, Dr. Terzian entered the family medicine program at Mountainside in July of 2021.  Unfortunately, once in the program, Dr. Terzian faced bias and discrimination from the program's leadership, Program Director Dr. Kevin Berg and Associate Program Director Dr. Preethi George. Dr. Berg and Dr. George set up Dr. Terzian for failure. Their evaluations of her were more negative than those from other faculty members, who evaluated Dr. Terzian as on the level of other residents and improving. Dr. Berg even altered reports documenting Dr. Terzian's performance against family medicine standard milestones in an effort to justify her dismissal from the program. In March and April 2022, Dr. Berg placed Dr. Terzian on remediation and then probation for outdated and pretextual reasons. Dr. Terzian met all the conditions of both plans. Despite that, on May 6, 2022, Dr. Berg and Dr. George met with Dr. Terzian and pressured her to resign to avoid termination.

After Dr. Terzian retained counsel, she was permitted to rescind her resignation and was terminated. Dr. Terzian then filed an appeal of her termination. Despite the requirement under New Jersey law that a medical resident must receive a fair procedure at which to challenge a termination, Mountainside failed to provide a fair procedure. Dr. Terzian was denied the assistance of counsel at the hearing despite the requirement that a resident who is making

allegations of discrimination have that assistance. Dr. Terzian was not even permitted to attend the portion of the hearing at which Dr. Berg argued for her termination. After Mountainside's one-sided hearing, her termination was upheld.

According to Dr. Laura M. Famiglio, a physician and medical educator with direct experience building and leading Graduate Medical Education (GME) programs, Mountainside should not have terminated Dr. Terzian, and the procedure at the hearing concerning the termination was fundamentally unfair.

Dr. Terzian now seeks a temporary restraining order and a preliminary injunction, ordering her to be reinstated to the program, or alternatively, ordering that Mountainside provide her with the fair hearing, with the assistance of counsel, as required by New Jersey law. Dr. Terzian requires immediate relief because without it she will be irreparably harmed. Prevailing at the end of the lawsuit will be a Pyrrhic victory as reinstatement would likely be no longer possible as Dr. Terzian's skills and medical knowledge would have eroded to the point that she could not complete the requirements of the program. Damages will not adequately compensate Dr. Terzian for the death of her dream of being a practicing physician in this country. As many other courts have done in these circumstances, the Court should grant provisional relief.

## STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

### A.  Dr. Terzian's Background.

Dr. Terzian is 57 years old.[1] She was born in Syria and attended medical school in Armenia.[2] The program was conducted in the Russian language which required Dr. Terzian to learn Russian as a prerequisite for enrolling in the program.[3]  After completing the six-year

---

[1] See Declaration of Lina Terzian D.O. ("Terzian Dec."). ¶2.
[2] Id.
[3] Id.

program, Dr. Terzian returned to Syria where she completed an Obstetrics/Gynecology residency program and then practiced as an OB/GYN physician for approximately five years.[4]

In 2002, Dr. Terzian emigrated to the United States after marrying an American man.[5] Dr. Terzian then began her efforts to practice medicine in the United States.[6] Even though Dr. Terzian passed the required USMLE examinations, she was not able to obtain a placement in a residency program.[7] Completion of least some portion of a residency program is required to become a licensed physician in this country.[8]

In 2015, after having her son, Dr. Terzian decided to redo her medical education to improve her chances of being accepted into a residency program.[9] Dr. Terzian enrolled in the osteopathic medicine program at New York Institute of Technology College of Osteopathic Medicine.[10] After finishing the program and passing the required examinations for osteopathic graduates, Dr. Terzian again applied for residency programs through the National Residency Match Program.[11] In that program, medical graduates and residency programs rank each other and are then placed into programs based on the match rankings.[12] As a result of the match, Dr. Terzian was placed into the family medicine residency program at Mountainside.[13]

---

[4] Id. ¶ 3
[5] Id. ¶ 4.
[6] Id. ¶ 5.
[7] Id.
[8] Id.
[9] Id. ¶ 6.
[10] Id.
[11] Id.
[12] Id. *See* https://www.nrmp.org/intro-to-the-match/
[13] Id.

B.      **Dr. Terzian Experiences Discrimination at Mountainside.**

When Dr. Terzian entered Mountainside's family medicine residency program in July of 2021, she was the oldest woman in the residency program by at least 25 years.[14] From the beginning of Dr. Terzian's time in the program, she noticed that the program director, Dr. Kevin Berg, and the associate program director, Dr. Preethi George, were hostile to her, treated her differently than other residents and made it difficult for her to succeed.[15]

Throughout Dr. Terzian's time in the residency, Dr. Berg humiliated her by ridiculing her in front of other residents.[16] In addition, Dr. Berg would often harshly criticize Dr. Terzian for a presentation of a patient's case when she had already presented the case to an experienced resident who had approved the exact same presentation to which Dr. Berg objected.[17] Dr. Berg did not treat younger residents or male residents in this fashion.[18] Dr. Berg and Dr. George frequently expressed their issues with Dr. Terzian in terms related to her age, often criticizing her lack of knowledge on a topic or difficulty with an aspect of her duties as something that should not be happening at her age.[19] Shortly before Dr. Terzian's termination, a faculty member, Dr. AnnGene Anthony, told Dr. Terzian that she was "too old" to be in a residency program and should seek other employment.[20]

Within the first month of the residency program, Dr. Terzian told a senior resident that she was having difficulty with EPIC, the medical records software used at Mountainside.[21] The senior resident advised her to ask Dr. George, who was Dr. Terzian's assigned mentor, for help.[22]

---

[14] Id. ¶ 7.
[15] Id.
[16] Id. ¶ 22.
[17] Id.
[18] Id.
[19] Id. ¶ 23.
[20] Id. ¶ 28.
[21] Id. ¶ 8.
[22] Id.

When Dr. Terzian approached Dr. George, however, Dr. George expressed extreme frustration at being asked to help Dr. Terzian.[23] Furthermore, the senior resident told Dr. Terzian that Dr. George was upset with him for suggesting that Dr. Terzian go to her for help.[24] Thereafter, Dr. Berg and Dr. George consistently faulted Dr. Terzian for her difficulties with EPIC but did not offer her any assistance with the software.[25]

Later in the residency, when Dr. Berg faulted Dr. Terzian for gaps in her medical knowledge, she requested that he speak to a tutor who had helped Dr. Terzian pass her osteopathic exams.[26] Dr. Terzian hoped that Dr. Berg and the tutor could work together on how to help her, but Dr. Berg refused to communicate with the tutor.[27]

Dr. Berg and Dr. George also consistently evaluated Dr. Terzian far more negatively than the other attendings who evaluated her. Dr. Berg gave Dr. Terzian extremely negative evaluations for periods in July 2021 and December 2021.[28] Consistent with Dr. Berg's conduct in setting up Dr. Terzian for failure, Dr. Berg did not record these negative evaluations for several months, so that Dr. Terzian was not able to use the evaluations to improve her performance.[29] Dr. George gave Dr. Terzian extremely negative evaluations in November 2021, January 2022, and April 2022.[30]

Meanwhile, other faculty members in the residency program provided Dr. Terzian with far more positive evaluations. In September 2021, Dr. Terzian received an evaluation of excellent in all categories from Dr. Kartik Gohil in the ambulatory care rotation.[31] In October

---

[23] Id.
[24] Id.
[25] Id.
[26] Id. ¶ 9.
[27] Id.
[28] *See* Evaluations of Lina Terzian, D.O. ("Evaluations") at 84, 88. Attached as Exhibit A to Terzian Dec.
[29] Id.
[30] Id. at 118,122, 128.
[31] Id. at 3.

2021, Dr. Jonathan Mintzer evaluated Dr. Terzian as "Above Average" and noted that she was "Enthusiastic" and "Eager to participate and learn."[32]

In February 2022, Dr. Enrique Feoli, who had supervised Dr. Terzian in a rotation at Hackensack University Medical Center, wrote about her as follows:

> She is a dedicated physician who cares deeply for her patients. Her presentations during rounds were accurate and very thorough. All the details on the patient's history and details of the physical examination were well explained. In summary, she is a well-rounded physician with excellent human qualities, and I am sure she will do very well in her residency and as a family practitioner in the future.[33]

For the most part, Dr. Terzian received overall evaluations of "Average" from the faculty members, indicating that she was on par with other residents in the program.[34] Specifically, out of the 26 evaluations Dr. Terzian received from attending physicians, 22 contained an overall rating of average or better.[35]

Faculty members noted that Dr. Terzian was learning and improving–which is, of course, the point of a residency program.[36] In an end-of-shift evaluation from November of 2021, Dr. Valery Vera-Connolly noted that Dr. Terzian was "clearly improving in her performance in the clinical setting."[37] In February 2022, Dr. AnnGene Anthony stated that Dr. Terzian had exhibited "growth in documenting complex medical plans during rotation."[38] In this evaluation Dr. Anthony also noted the following about Dr. Terzian: "Heart in the right place"; "Kind, caring and compassionate," "Actively seeks assistance," "readily accepts feedback," "Written

---

[32] Id. at 11.
[33] Letter from Dr. Feoli, Attached to Terzian Dec. as Exhibit B.
[34] Terzian Dec. ¶ 14.
[35] Id.
[36] Terzian Dec. ¶15.
[37] Evaluations at 62.
[38] Id. at 83.

documentation appropriate and timely," and "Courteous and professional in her interactions with staff, specialists and residents."[39]

In March 2022, Dr. Robert Montemurro evaluated Dr. Terzian as "Above Average" and noted that she was "improving," "much calmer," and "eager to learn."[40] In April 2022, Dr. Mintzer noted that that Dr. Terzian had exhibited "much improved interaction with staff from prior rotation," and that she was "[i]nquisitive, enthusiastic, [and] interested in rotation."[41]

Despite these positive evaluations, on March 7, 2022, Dr. Terzian was  placed on a remediation plan.[42] There was no justification for the remediation plan.[43] Some of the reasons given, such as a mistake Dr. Terzian had made in administering a vaccine, had occurred several months prior.[44] Others had been contradicted and unfair.[45] For example, the remediation plan stated that Dr. Terzian "was reported to have a pushy demeanor with nurses,"[46] even though that remark was from several months prior,[47] and Dr. Terzian had more recently been praised for her dealings with staff members, including an evaluation Dr. Terzian had received from a nurse, Patricia DeFillippo, just two weeks prior to the remediation plan, which described Dr. Terzian as kind and respectful to patients and co-workers.[48] Even though Dr. Terzian believed the remediation plan was unjustified, she followed the remediation plan and performed all of the extra tasks required which consisted largely of extra reading, additional presentations and training modules.[49]

---

[39] Id.
[40] Id. at 23.
[41] Id. at 15.
[42] Formal Letter of Remediation ("Letter of Remediation"), March 7, 2022. Attached to Terzian Dec. as Exhibit F.
[43] Terzian Dec. ¶ 24.
[44] Id.
[45] Id.
[46] Letter of Remediation. at 1.
[47] Email from Jonathan Mintzer to Kevin Berg, October 28, 2021, Attached to Terzian Dec, as Exhibit G.
[48] Evaluations at 105.
[49] Terzian Dec. ¶25.

Despite Dr. Terzian's completion of all the requirements of the remediation plan, and despite the fact that she was receiving satisfactory evaluations from the other attending physicians in the department, on April 7, 2022, Dr. Berg placed her on probation.[50] The probation plan was almost identical to the remediation plan, even though she had completed the designated tasks already as part of the remediation plan.[51]  It also contained the same stale and unfair criticisms, such as that Dr. Terzian had "a pushy demeanor with nurses."[52] Although Dr. Terzian continued to believe Dr. Berg was treating her unfairly and the probation was completely unjustified, she complied with the requirements of the probation plan.[53]

Dr. Berg was, however, determined to get rid of Dr. Terzian.

On April 27, 2022, Dr. Berg emailed Nicole Williams, from Mountainside's HR department, to inform her that he had decided not to offer Dr. Terzian a contract for the following year.[54] Dr. Berg stated that Dr. Terzian "is not progressing as a [first year resident] and is not ready for [her second year of residency].[55] Dr. Berg justified the decision to not offer her a contract, in part, by misrepresenting that Dr. Terzian "ha[d] not met her mid-year or end of year PGY1 Level ACGME milestones and as a result we will be unable to award Lina any credit for time spent during her first year of residency."[56]

In this email, Dr. Berg is referring to the ACGME milestones. The ACGME, which is the accreditation body for medical residency programs,[57] establishes milestones for different

---

[50] Id. ¶26.
[51] Formal Letter of Probation ("Letter of Probation"), April 7, 2022, attached to Terzian Dec. as Exhibit H.
[52] Terzian Dec. ¶26.
[53] Id. ¶27.
[54] Email from Kevin Berg to Nicole Williams, April 27, 2022, attached to Terzian Dec. as Exhibit E.
[55] Id.
[56] Id.
[57] *See* https://www.acgme.org/about-us/overview/

residency programs and requires the programs to report residents' progress on them, on a semiannual basis.[58]

Contrary to Dr. Berg's email to Ms. Williams, at mid-year Dr. Terzian was found to be at Level One or above in 13 out of the 18 milestones – at least based on what the program had reported to the ACGME.[59] Dr. Berg, however, at some point thereafter created a new mid-year milestone report to indicate that that Dr. Terzian had not achieved Level One in any of the 18 milestones,[60] so that he could then claim that Dr. Terzian had not achieved any of the Level One milestones at mid-year. With respect to the end-of-year milestones, Dr. Terzian had not yet completed her first year, so it was disingenuous for Dr. Berg to claim she had not reached them.

### C. Dr. Berg Attempts to Force Dr. Terzian to Resign.

On the morning of May 6, 2022, one week after the misleading email concerning Dr. Terzian's progress on the milestones, Dr. Berg and Dr. George met with Dr. Terzian and pressured her to resign.[61] Dr. Berg repeatedly threatened Dr. Terzian that if she did not resign, she would be terminated, and that it would irreparably damage her career.[62] That morning Dr. Terzian relented to the pressure and agreed to resign.[63] Later that day, Dr. Terzian reconsidered and asked to rescind her resignation.[64] Nicole Williams, the Mountainside's HR representative, pressured Dr. Terzian to not rescind the resignation, threatening her again that it would ruin her career if she did not resign.[65] Dr. Terzian again relented to the pressure and decided to leave her

---

[58] *See* Milestones Guidebook for Residents and Fellows p.8, available at
https://www.acgme.org/globalassets/pdfs/milestones/milestonesguidebookforresidentsfellows.pdf
[59] Resident Milestone Evaluation: Mid-Year 2021-2022, attached to Terzian Dec. as Exhibit C.
[60] CCC Milestone Review, attached to Terzian Dec. as Exhibit D.
[61] Id. ¶ 29.
[62] Id.
[63] Id. ¶30.
[64] Id.
[65] Id.

resignation in place.[66] Thereafter, Dr. Terzian retained counsel who successfully petitioned Mountainside to allow her to rescind her resignation.[67] Dr. Terzian was then terminated from the residency program on June 7, 2022.[68] Dr. Terzian was permitted to work, treating patients, up until the time of her termination, and had never been suspended.[69]

**D. Mountainside Denies Dr. Terzian a Fair Appeals Procedure.**

On June 3, 2022, pursuant to Mountainside's procedures, Dr. Terzian sent a letter requesting an appeal to Dr. Bijal Mehta, the head of Graduate Medical Education at Mountainside and the person in charge of the appeals process.[70] In the letter, Dr. Terzian specifically noted that she believed that Dr. Berg was "biased against [her] from the beginning."[71] Thereafter, on June 8, 2022, Dr. Terzian sent an email to Dr. Mehta specifically stating that Dr. Berg had been biased against her based on her age and sex and requested the assistance of counsel at the hearing.[72] The next day, Dr. Mehta responded by email stating that Dr. Terzian could not have counsel represent her at the hearing.[73] Dr. Mehta also informed Dr. Terzian that she would assign Dr. Terzian a designated support person at the hearing.[74]

On June 21, 2022, the hearing was held via videoconference.[75] It lasted 90 minutes.[76] Dr. Berg presented to the appeals committee for 45 minutes.[77] Although Dr. Terzian attempted to log on for the that portion of the hearing, Dr. Mehta informed her that she was not permitted to be

---

[66] Id.
[67] Id. ¶31.
[68] See Letter from Kevin Berg to Lina Terzian, June 7, 2022, attached to Terzian Dec. as Exhibit I.
[69] Id. ¶33.
[70] Letter from Dr. Terzian to Dr. Mehta, June 3, 2022, attached to Terzian Dec. as Exhibit J.
[71] Id.
[72] Email from Lina Terzian to Bijal Mehta, June 8, 2022, attached to Terzian Dec, as Exhibit K.
[73] Email from Bijal Mehta to Lina Terzian, June 9, 2022, attached to Terzian Dec. as Exhibit L.
[74] Id.
[75] Terzian Dec. ¶ 36.
[76] Id.
[77] Id.

present for that portion of the hearing.[78] Dr. Terzian was then forced to present the case against her termination without any knowledge concerning the specifics of Dr. Berg's presentation.[79] Dr. Terzian argued why she should not be terminated, based on the positive evaluations she received from most of the faculty members and Dr. Berg's bias against her.[80]

On June 24, 2022, Mountainside's appeals panel affirmed the termination decision.[81] As a result of being terminated prior to finishing one year of a residency program, Dr. Terzian is ineligible to practice medicine anywhere in the United States.[82] According to Dr. Terzian's expert witness, Linda Famiglio, M.D., a physician with a long career in medical education, as a result of Dr. Terzian's termination, she will be unable to obtain another residency position.[83]

On July 1, 2022, Dr. Terzian, whose permanent home is in Massachusetts, filed this action under the Court's diversity jurisdiction, alleging that Mountainside discriminated against her based on her age and sex in violation of New Jersey's Law Against Discrimination and violated her right under New Jersey law to a fair procedure to challenge her termination.[84]

## ARGUMENT
### THE COURT SHOULD REINSTATE DR. TERZIAN, OR ALTERNATIVELY, REQUIRE MOUNTAINSIDE TO GRANT HER A FAIR HEARING WITH THE ASSISTANCE OF COUNSEL.

#### A. The Applicable Legal Standard

This Court has previously identified the four factors to be considered in determining whether to grant a temporary restraining order or preliminary injunction: "(1) whether the movant has shown a reasonable probability of success of the merits; (2) whether the movant will

---

[78] Id.
[79] Id.
[80] Id.
[81] Letter to Lina Terzian from Bijal Mehta, June 24, 2022. Attached to the Terzian Dec as Exhibit M.
[82] Id. ¶ 38.
[83] Declaration of Linda Famiglio, M.D. ¶8.
[84] ECF Docket No. 1

be irreparably injured by [denial of the relief]; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest." *D.M. v. N.J. Dep't of Educ.*, 2014 U.S. Dist. LEXIS 119876, at *6-7 (D.N.J. Aug. 28, 2014). Of these factors, irreparable harm is the most important one. *See Continental Group, Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 356 (3d Cir. 1980).

> **B. Dr. Terzian will be Irreparably Harmed Prior to a Resolution on the Merits Absent an Injunction Ordered by the Court.**

If the Court does not grant the provisional relief requested, Dr. Terzian will, at minimum, lose the 10 months of residency training she had undergone at Mountainside and will likely permanently lose the opportunity to practice medicine in the United States. If Dr. Terzian is required to wait until the end of the case to obtain relief, Mountainside would likely take the position that reinstatement is no longer feasible because Dr. Terzian's medical skills and knowledge would have eroded in the months and likely years since she last worked as a doctor. Without reinstatement, Dr. Terzian would have no recourse other than money damages, which would be inadequate to compensate her for the time spent in the residency program and the loss of her medical career.

Similarly, with respect to Dr. Terzian's alternative request for relief in the form of a new hearing with the assistance of counsel and basic procedural safeguards, Dr. Terzian needs that relief now as granting such a hearing at the end of the case will amount to an empty gesture as Mountainside could simply rule against her based on her time away from the practice of medicine.

This constitutes irreparable harm.  In *Doe v. Pa. State Univ.*, 276 F. Supp. 3d 300 (M.D. Pa. 2017), the court held that a student's suspension, which would have interfered with the student's future medical career, constituted irreparable injury warranting the issuance of a

preliminary injunction reinstating the student. *Id.* at 313-315. *See also Ramsay v. Nat'l Bd. of Med. Exam'rs,* 968 F.3d 251, 262-263 (3d Cir. 2020) (irreparable harm shown where plaintiff established defendant's conduct "jeopardizes her opportunity to pursue her chosen profession.") (internal quotes omitted); *Fenje v. Feld,* 2002 U.S. Dist. LEXIS 9492, *18 (N.D. Ill. May 28, 2002) (finding, in the context of a preliminary injunction motion by a medical resident seeking reinstatement, that "monetary relief would not be an adequate remedy because it would still leave plaintiff without the ability to practice in his chosen field"); *Doe v. Rensselaer Polytechnic Inst.*, 2020 U.S. Dist. LEXIS 191676, at *34 (N.D.N.Y. Oct. 16, 2020) ("Calculating the exact monetary value of plaintiff's right to be secure in his belief that his future will be decided fairly is a task far beyond this Court's capabilities, and thus plaintiff's argued imminent harm is also irreparable.").

### C. Dr. Terzian has a Reasonable Probability of Success on the Merits of Her LAD Claim.

To determine whether there is a reasonable probability of success, a court examines whether there is sufficient evidence to satisfy the essential elements of the underlying cause of action. *See Punnett v. Carter*, 621 F.2d 578, 582-83 (3d Cir.1980). For an LAD wrongful termination claim, the essential elements are that the plaintiff: (1) belongs to a protected class; (2) held a position for which he or she was objectively qualified; (3) was terminated from that position; and (4) the employer sought to, or did, fill the position with a similarly qualified person. *See Viscik v. Fowler Equipment Co.*, 173 N.J. 1, 800 A.2d 826, 833 (N.J. 2002). Where, as here, Dr. Terzian was not immediately replaced, a plaintiff may show "that the challenged employment decision . . . took place under circumstances that give rise to an inference of unlawful discrimination." *Williams v. Pemberton Tp. Public Schools*, 323 N.J. Super. 490, 502 (Super. Ct. App. Div. 1999).

Dr. Terzian satisfies established reasonable probability of success with respect to her LAD age and sex discrimination claims. It is undisputed that (1) Dr. Terzian is in a protected class, (2) is qualified for the position of medical resident, as shown by her prior education and experience as well as the positive evaluations she received, and (3) she was terminated – an adverse employment action. Since there is no evidence as to whether Dr. Terzian was replaced, or if so, by whom, Dr. Terzian can prove discriminatory intent by pointing to the circumstances surrounding her treatment in the residency program. These include the evidence of the bias of Dr. Berg and Dr. George against Dr. Terzian including their criticism of her in age-related terms and their evaluating her far more negatively than other faculty members had evaluated her. Perhaps most significantly, Dr. Berg and Dr. George appeared to go out of their way to make sure Dr. Terzian did not succeed. Dr. George refused to help Dr. Terzian when she asked for help with Mountainside's medical records software and even criticized the senior resident for suggesting to Dr. Terzian that she seek help. Dr. Berg went further and  altered Dr. Terzian's milestone evaluations to justify her termination. This Court has denied summary judgment on similar facts. *See Maresca v. Port Auth. of NY & NJ*, 2012 U.S. Dist. LEXIS 182484, at *32-33 (D.N.J. Dec. 27, 2012) (noting that evidence of discrimination can be drawn from adverse action despite positive evaluations). *See also Steward v. Altoona First Sav. Bank*, 2014 U.S. Dist. LEXIS 124908, at *29 (W.D. Pa 2014 Sep. 8, 2014) (finding discriminatory intent where there was evidence "indicative of a preordained decision to terminate Plaintiff's employment based on non-performance-based considerations").

According to Dr. Laura M. Famiglio, a physical and medical educator with direct experience building and leading teaching hospitals and GME programs, Mountainside's

termination of Dr. Terzian was "unwarranted."[85] Specifically, Dr. Famiglio found, based on a review of materials provided to Dr. Terzian concerning her termination, that it is "unclear and potentially unfounded that [Dr. Terzian] was terminated instead of being allowed to complete the PGY 1 year."[86] The program policy provides that the program can terminate a resident "for persistent unsatisfactory performance while on Probation or for egregiously unprofessional conduct," but no evidence existed for either ground for termination.[87]

### D. Dr. Terzian Has a Reasonable Probability of Success on Her Due Process Claim.

Dr. Terzian's due process claim is even stronger. In *Hernandez v. Overlook Hospital*, 149 N.J. 68 (1997), the Supreme Court of New Jersey held that a medical resident is entitled to a "fair procedure," including "adequate notice of the charges and a reasonable opportunity to be heard," at which to challenge a termination. *Id.* at 77. The Court noted while there is not ordinarily the right to assistance of counsel at such a hearing, where the resident "claims that the termination was motivated by reasons which violated the resident's Civil Rights … the right to counsel at a resident's termination proceeding would be appropriate to vindicate those substantive rights and protect the public from discriminatory hiring and termination practices." *Id. at 80.*

There is really no dispute that Dr. Terzian was denied the rights set out in the *Hernandez* decision. Prior to the hearing, she provided notice to Mountainside that she believed that she had been discriminated against based on her age and sex and requested the assistance of counsel. That request was denied. Even putting aside the denial of the assistance of counsel, the hearing was hardly a "fair procedure." Dr. Terzian was not permitted to have the assistance of a non-

---

[85] Declaration of Dr. Laura M. Famiglio ("Famiglio Dec.) ¶ 2.
[86] *Id.* ¶¶ 2-3.
[87] *Id.* ¶ 6.

lawyer of her choosing at the hearing. Most significantly, Dr. Terzian was denied the opportunity

to question the witnesses against her or even hear their testimony. This severely compromised

her ability to defend herself. Dr. Terzian had, and still has, no idea how Dr. Berg handled the fact

that the great majority of her evaluations were neutral or positive or that she had completed the

assignments of her remediation and probation plans. Dr. Famiglio determined that this procedure

was "unfair."[88] Dr. Famiglio specifically determined that the Appeal Board erred when it "did

not allow the resident an opportunity to hear the arguments and evidence resulting in her

termination status and therefore did not provide information as to why the program director

decided on immediate termination[.]"[89]

Courts have granted injunctions in similar instances where students were subjected to

unfair hearing procedures. In *Doe v. Univ. of Notre Dame*, 2017 U.S. Dist. LEXIS 69645 (N.D.

Ind. May 8, 2017), the district court granted an injunction reinstating the plaintiff based on the

unfairness of a hearing in which the student was allowed to listen to and question witnesses but

was denied the opportunity to meaningfully consult with the student's advisor. *See also Doe v.*

*Weill Cornell Med. Coll. of Cornell Univ.*, No. 16-CV-3531 (WHP), 2016 U.S. Dist. LEXIS

75238, *2-3 (S.D.N.Y. June 8, 2016) (referencing the Court's previously granted injunction

ordering the defendant to confer a medical degree on the plaintiff because "he was denied an

'adjudication/disciplinary process that adheres to legal and policy requirements of due

process.'"); *Grudzinski v. Medical College of Ohio*, 2000 Ohio App. LEXIS 1622, (Ohio Ct.

App. Apr. 12, 2000) (affirming a trial court grant of a preliminary injunction reinstating the

plaintiff to her surgical residency program based on a "sham" appeals hearing where the

"plaintiff [was] restricted to a very limited time within which to present any defense to the

---

[88] Famiglio Dec. ¶ 2.
[89] *Id.* at ¶ 7.

charges," and the decision was based on evidence not made available to the plaintiff); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 396, 407 (6th Cir. 2017) (affirming a trial court grant of a preliminary injunction reversing a suspension of the plaintiff from the defendants' university when the plaintiff was denied the opportunity to confront an adverse witness due to the witness not appearing at the disciplinary hearing, stating, "[d]efendants' failure to provide any form of confrontation of the accuser made the proceeding against John Doe fundamentally unfair."); *Roe v. Adams-Gaston*, No. 2:17-cv-945, 2018 U.S. Dist. LEXIS 185697, *49 (S.D. Ohio Apr. 17, 2018) (granting a preliminary injunction enjoining defendants from disciplining the plaintiff based on the outcome of a hearing in which plaintiff was denied the opportunity to cross-examine her accusers).

### E. Mountainside Would Not Be Unduly Harmed by Granting the Requested Relief.

Especially when compared to the harm caused to Dr. Terzian by termination, any harm to Mountainside is minimal. Mountainside is after all, a teaching hospital, and cannot be severely burdened by the presence of another resident. It is worth noting that Dr. Terzian was permitted to work, treating patients up until the time of her resignation and was never suspended. The Court can certainly infer that Mountainside never believed that Dr. Terzian was a danger to patients such that she needed to be immediately removed from duty. Indeed, as evidenced by the April 27, 2022 email to Mountainside HR stating that Dr. Terzian would not have her contract renewed, Dr. Berg appeared to be most concerned by the prospect of Dr. Terzian not progressing sufficiently to perform well in her second year, when she would be expected to supervise first year residents. Accordingly, permitting Dr. Terzian, at minimum, to finish her first year would cause Mountainside little harm. With respect to Dr. Terzian's alternative request for a new hearing with the assistance of counsel, there is no ascertainable harm to Mountainside.

17

**F. The Public Interest Would Be Served by the Issuance of an Injunction.**

As the *Hernandez* court recognized, it is in the public interest "to protect the public from discriminatory hiring and termination practices." 149 N.J. at 80. *See also Commonwealth v. Rizzo*, Civil Action No. 74-258., 1974 U.S. Dist. LEXIS 7442, *22 (E.D. Pa. July 26, 1974) (holding that the public interest "requires" the termination of discriminatory employment practices); *Hornstine v. Twp. of Moorestown*, 263 F. Supp. 2d 887, 913 (D.N.J. 2003) ("Indeed, the imposition of temporary restraints furthers the goal of eradicating discrimination and is, therefore, certainly in the public interest.").

Courts have found that the issuance of a preliminary injunction is in the public interest when it protects the plaintiff's due process rights in an educational setting. *See, e.g.*, *Doe v. Pa. State Univ.*, 276 F. Supp. 3d 300, 316, fn. 112 (M.D. Pa. 2017) (citing *Doe v. University of Cincinnati*, 223 F.Supp.3d 704, 712 (S.D. Ohio 2016) (finding that a plaintiff has adequately shown that the issuance of an injunction is in the public interest where he has alleged a violation of his due process rights based on the university's deviation from its own policies)). Further, in enacting a law prohibiting forms of discrimination, such as the LAD, the legislature has demonstrated its view that eliminating those forms of discrimination serves the public interest. *See, e.g.*, *Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 263 (3d Cir. 2020) ("In enacting the ADA, Congress demonstrated its view that the public has an interest in ensuring the eradication of discrimination on the basis of disabilities.") (quotation marks omitted). Lastly, "the injunction allows [the plaintiff] to continue her medical education and therefore serves the public interest in training more physicians." *Id.*

## **CONCLUSION**

This Court should grant the attached order granting a temporary restraining order or a preliminary injunction reinstating Dr. Terzian, or alternatively, directing Mountainside to provide Dr. Terzian with a new hearing in which she can fully attend and participate with the assistance of counsel, along with any other conditions the Court finds necessary.

Dated: July 21, 2022
        New York, New York

GISKAN SOLOTAROFF & ANDERSON LLP

/s Catherine E. Anderson
Jason L. Solotaroff (pro hac vice pending)
Attorneys for the Plaintiff
90 Broad Street, 2nd Fl.
New York, NY 10004
(212) 847-8315
jsolotaroff@gslawny.com