## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LINA TERZIAN, D.O., <br><br> Plaintiff, <br><br> -against- <br><br> MONTCLAIR HOSPITAL, LLC d/b/a HACKENSACK MERIDIAN MOUNTAINSIDE MEDICAL CENTER, <br><br> Defendant. | Civil Action No. 2:22-cv-04396-ES-ESK <br><br> *Civil Action* <br><br> **DECLARATION OF DR. KEVIN BERG, MD, FAAFP IN SUPPORT OF MONTCLAIR HOSPITAL, LLC'S OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR ORDER TO SHOW CAUSE** |

I, Kevin Berg, MD, FAAFP, declare as follows:

1. I am a Medical Doctor and a Fellow in the American Academy of Family Physicians. I am employed by Defendant Montclair Hospital, LLC d/b/a Hackensack Meridian Mountainside Medical Center ("Mountainside"). I serve as Program Director of the Family Medical Residency Program, Medical Director of the Mountainside Family Practice Group, and am an Assistant Professor at Hackensack Meridian School of Medicine.

2. I understand that Lina Terzian has filed a motion with this Court to request that the Court Order Mountainside to reinstate her to the medical residency program or provide her with a new appeal hearing where her attorney can represent her. I respectfully submit this declaration in support of Mountainside's Opposition to her motion for that relief.

3. I have personal knowledge of all the facts stated herein based on my personal knowledge and my review of Dr. Terzian records.

1

4. Mountainside is a full service 365-bed community hospital that treats a wide range of medical conditions and provides access to innovative and effective treatment alternatives at specialized centers within the hospital that focus on imaging, women's health, heart disease, cancer care, surgery, obesity, stroke, and chronic kidney disease.

5. Mountainside also serves as a teaching institution for its residency programs in Family Medicine, Internal Medicine, and Dentistry, and pharmacy.

**Mountainside Family Medicine Residency Program**

6. I serve as the Residency Program Director of Mountainside's Family Medicine Residency Program ("Family Medicine Program").

7. Mountainside's Family Medicine Program provides its residents a cohesive, dedicated faculty with decades of experience training physicians in Family Medicine and embraces a diverse patient, resident, and faculty population.

8. The Family Medicine Program places an emphasis on preparing family physicians for the future including interdisciplinary training, health systems management, and patient centered primary care.

9. To that end, Mountainside provides its residents with a Graduate Medical Education Manual ("GME Manual") that provides its residents guidelines, procedures, and policies of Mountainside's Residency Programs. *See* **Exhibit A**, Mountainside GME Manual, relevant portions of which are attached.

10. Included in the GME Manual is Mountainside's Disciplinary/Remedial/Dismissal Actions Policy and Procedure ("Discipline Policy"). *Id.* at 27.

11. The purpose of Mountainside's Discipline Policy is to provide guidance to resident, Program Directors, and the Site Designated Institutional Official ("DIO"), Dr. Bijal S. Mehta, MD, FACP, on the Disciplinary, Remedial, and Dismissal actions at the hospital. *Id.*

12. The Discipline Policy provides a number of actions that can be taken when the performance of resident is deemed deficient in a competency, including: (1) counseling; (2) remediation; (3) probation; and (4) dismissal. *Id.* at 27-29.

### *Counseling*

13. Pursuant to the Discipline Policy, at first recognition of a deficiency in a competency, the resident will be given verbal feedback in how to improve and expectations will be reiterated. *Id.* at 27.

14. At the second episode of a deficiency, the resident will again be given verbal feedback and expectations will be reiterated. *Id.*

15. At the third episode of a deficiency, as a pattern of behavior has now been documented, the program will officially place the resident on Remediation for the deficiency. *Id.* at 27-28.

### *Remediation*

16. When a resident is placed on Remediation for persistent deficiencies in her clinical or educational performance, the Program Director will meet with the resident and an additional faculty member and review the deficiencies. *Id.* at 28.

17. Additionally, the Site DIO will be notified of any proposed action by the Program Director.

18. During the Remediation, the resident will be expected to meet with the Program Director at least every two weeks for mentoring/coaching meetings. *Id.*

19. After the Remediation period, the Program Director and Site DIO will re-evaluate the resident's performance and after reviewing her progress, recommend one of the following: (1) Removal from Remediation; (2) continuation of Remediation; (3) Probation; or (4) Dismissal. *Id.*

### *Probation*

20. Residents may be placed on Probation by the Program Director for persistent deficiencies while on Remediation, egregious infractions of resident rules, or if her performance and/or professional behavior fails to meet the standards set by their training program, accrediting body, or those of the hospital. *Id.*

21. The resident will receive written notification that she has been placed on Probation. This notice will include the reasons for the action, the detailed areas of concern, a specific behavioral contract, and an end date for an evaluation of the Probationary period. *Id.*

22. The resident has the right to appeal the decision to place the resident on Probation in accordance with the GME's Grievance and Due Process Policy. *Id.*

23. During Probation, the resident will be expected to meet with the Program Director or assigned faculty member every week for mentoring/coaching meetings. At the end of the Probation period, the Program Director and Site DIO will re-evaluate the progress and performance of the resident and recommend one of the following: (1) Removal from Probation; (2) Continuation of Probation; or (3) Dismissal. *Id.*

### *Dismissal*

24. A Program Director may decide to dismiss a resident during the term of her contract for persistent unsatisfactory performance while on Probation or for egregiously unprofessional conduct. *Id.* at 29.

25. Reasons for Dismissal include, but are not limited to:

    a. Failure to achieve the learning objectives of the program in which the individual is training;

    b. Substandard clinical practice and judgment, which may present a compromise to acceptable procedures of patient care, or jeopardize patient welfare;

    c. Failure to develop sufficient technical skills;

    d. Failure to develop sufficient supervisory skills;

    e. Excessive tardiness and/or absenteeism, which disrupts training;

    f. Unethical, illegal, or unprofessional conduct;

    g. Non-compliance with Mountainside Meridian Mountainside Medical Center policies and procedures; and

    h. Non-compliance with the State Board of Medical Examiners or State Board of Dentistry regulations.

*Id.*

26. The decision of the Program Director and Site DIO for Dismissal shall be conveyed both verbally and in writing, outlining the areas deemed unsatisfactory and the reasons for Dismissal. Dismissal in this situation implies poor performance or malfeasance and is subject to appeal. *Id.*

**Dr. Terzian's Residency with Mountainside**

27. In July 2021, Dr. Terzian entered Mountainside's Family Medicine Residency Program.

28. As an initial matter, I understand that Dr. Terzian alleges that I, along with Associate Program Director, Dr. Preethi George, treated her differently because of her age since the beginning of the residency program. This allegation is completely false. Our residency

program recently graduated an individual who was over fifty years old. We also did not meet Dr. Terzian for the first time in the residency program. A residency candidate must "match," and as part of that process in regards to Dr. Terzian, both Dr. George and I interviewed her as part of her application to Mountainside's residency program. Dr. Terzian appeared to be of middle-age when I interviewed her months before the residency program. Along with Dr. George (and our other faculty), I voted to bring Dr. Terzian aboard into the residency program. I did not consider her age then or at any other point in time. Dr. Terzian is one of five women in her PGY-1 residency class of seven individuals. *See* **Exhibit N** Resident Narratives. Unfortunately, her serious performance deficits quickly emerged once she entered the residency program and they never abated.

29. As a part of a resident's orientation in July, the resident must take a "mock" In Training Examination ("ITE"), which operates as a competency test for the residents. Although this exam is a prior American Board of Family Medicine ("ABFM") exam, we refer to it as a "mock ITE" because the ABFM does not administer this exam during orientation. The ABFM administers its ITE exam to the resident class in October.

30. The high score on an ITE is 800.

31. A passing score on an ITE is 380.

32. On Dr. Terzian's mock ITE during orientation, she scored a 250, which is significantly below a passing score.

33. Due to Dr. Terzian's low score, the Clinical Competency Committee ("CCC"), comprised of myself, Dr. Everett W. Schlam, M.D., Dr. AnnGene Anthony, M.D., MPH, FAAFP, Dr. Preethi George, M.D., and Dr. Valery Vera-Connolly, M.D., requested that Dr. Terzian complete an Individualized Learning Plan ("ILP").

**Dr. Terzian's Initial Performance Issues Leading to Remediation**

34. Almost immediately after her residency began, Dr. Terzian began underperforming.

35. On August 12, 2021, Dr. Terzian had four incomplete patient notes from August 6, 2021 that needed to be completed. I informed Dr. Terzian that notes must be completed within 24 hours.

36. On September 13, 2021, Dr. Terzian had an incomplete patient note from September 10, 2021 that needed to be completed. I again informed Dr. Terzian that notes must be completed within 24 hours.

37. Additionally, in September 2021, Dr. Terzian bypassed Mountainside's Vaccine Administration Policy and Procedure ("Vaccine Policy") and administered an incorrect meningococcal vaccine to a patient. *See* **Exhibit B**, Vaccine Administration Policy & Procedure.

38. Dr. Terzian's disregard of the Vaccine Policy exemplified issues with Dr. Terzian's progress in patient care, medical knowledge, and professionalism.

39. Dr. Terzian was instructed to go over the vaccine administration training again and work on a presentation on vaccines to create a chart with pictures to avoid errors in the future.

40. On October 19, 2021, Dr. Terzian was unable to appropriately triage and assess a patient with chest pain in the clinic and was going to send the patient to the Emergency Department without knowing that an EKG could be done in the clinic.

41. On the same day, Dr. Terzian texted Dr. Connolly that she forgot to order medications for a patient. **Exhibit C**, 10/19/2021 Text Message.

42. On October 28, 2021, Dr. Jonathan Mintzer, M.D. emailed me with additional concerns regarding Dr. Terzian. **Exhibit D**, 10/28/2021 email from Dr. Mintzer to Dr. Berg.

43. Dr. Mintzer informed me that other nurses had reported concerns regarding Dr. Terzian. *Id.*

44. Specifically, Dr. Terzian reportedly in a state of agitation over a baby's hand who had acrocyanosis shortly after birth. *Id.*

45. Upon seeing the baby's hands, rather than discussing the situation with her attending physician, Dr. Terzian demanded that the nursery nurse immediately assess the baby. *Id.*

46. Dr. Mintzer also reported that Dr. Terzian exhibited a "pushy" demeanor in making requests and was not "thinking before speaking." *Id.*

47. In November 2021, Dr. Vera-Connolly provided another below average evaluation of Dr. Terzian stating that Dr. Terzian advised to be professional and empathetic with patients, to become more independent in developing and carrying out plans, to continue to working on organization to minimize mistakes or incomplete tasks, and to develop and carry out appropriate patient management plans for common and some complex clinical situations.

48. In December 2021, Dr. Terzian's scores from a second ITE she took in October 2021 indicated that **she again scored a 250**, another failing score. This ITE was administered by the ABFM.

49. This second failing test score signified that Dr. Terzian was *objectively* not improving and was showing a pattern of deficient behavior.

50. On December 24, 2021, I evaluated Dr. Terzian's performance, which was again deficient.

51. Specifically, in the evaluation, I noted that Dr. Terzian was struggling to keep up with the inpatient team and often seemed overwhelmed and frustrated. Basic computer skills did

not come easy to her, and she needed constant reinforcement by her peers. Dr. Terzian often seemed confused, unable to give an adequate differential diagnosis, and was lacking in basic preventative care.

52. On January 21, 2022, following her continued deficiencies, Dr. Terzian created a Family Medicine Residency Program Goal-Oriented Assessment of Learning ("GOAL") to assist with her deficiencies. *See* **Exhibit E**, Goal-Oriented Assessment of Learning Form.

53. On January 31, 2022, Dr. Khashayar Farhoomandi M.D. issued a negative evaluation regarding Dr. Terzian, indicating that Dr. Terzian struggled with, among other things, prioritizing tasks throughout the day, updating problem lists, being able to present patients to consultants efficiently and take recommendations, being able to accept patients from the Emergency Department Physicians and asking the right questions, and being able to enter correct orders or take instructions from seniors. *See* **Exhibit F**, 1/31/22 Dr. Farhoomandi Evaluation.

54. On March 5, 2022, Dr. Terzian received a negative evaluation from Dr. Sanyo Wen, M.D., indicating that Dr. Terzian still struggled completing notes within 24 hours, lacked problem solving skills, and was unable to consistently complete her to-do list despite others verbally instructing her and physically showing her how to perform her duties. *See* **Exhibit G**, 3/5/22 Dr. Wen Evaluation.

55. On March 6, 2022, Dr. Donald Fru, M.D. issued another negative evaluation regarding Dr. Terzian, indicating that Dr. Terzian was lacking significantly when compared to other first year residents he had previously worked with. Dr. Terzian's deficiencies included poor computer skills, difficulties putting in correct patient orders, not building a rapport with patients, not obtaining permission to perform her exams, and not answering patient questions because she

left in a hurry.  *See* **Exhibit H**, 3/6/2022 Dr. Fru Evaluation.  Dr. Fru did not believe that Dr. Terzian was making enough progress to take on the extra load of being a senior resident.

### Dr. Terzian's Remediation and Continued Deficiencies

56. On March 7, 2022, due to Dr. Terzian's continued and repetitive deficiencies, the CCC decided to place Dr. Terzian on Remediation to assist her in improving her performance.  *See* **Exhibit H**, 3/7/22 Formal Letter of Remediation.

57. Dr. Terzian was notified that the Remediation was a result of her deficiencies in the following areas:  (1) Medical Knowledge; (2) Systems Based Practice; (3) Interpersonal Communication Skills; and (4) Patient Care.  *Id.*

58. The Remediation included an Action Plan for each of these categories to provide Dr. Terzian guidance regarding how to improve her performance and be successful.  *Id.*

59. <u>At no point did Dr. Terzian claim that her placement on Remediation was due to any sort of age or gender discrimination.</u>

60. Unfortunately, after she was issued the Remediation, Dr. Terzian's serious performance deficiencies continued.

61. On March 27, 2022, Dr. Jasmine Gadhavi, M.D. issued a negative evaluation regarding Dr. Terzian's performance, indicating that Dr. Terzian became very overwhelmed with her patient assignment, had a difficult time efficiently prioritizing work, and appeared to have a disconnect between what was said to her and what she interpreted.  *See* **Exhibit I**, 3/27/2022 Dr. Gadhavi Evaluation.

### Dr. Terzian's Probation and Continued Deficiencies

62. On April 6, 2022, the CCC met as part of Dr. Terzian's planned Mid-Remediation review and determined that Dr. Terzian's progress to date was insufficient to allow her to progress to PGY 2 level of training. *See* **Exhibit J**, 4/7/22 Formal Letter of Probation.

63. The CCC determined that, at that point of the academic year, the CCC was not confident in Dr. Terzian's ability to properly and under indirect supervision, assess and manage patients, nor was the CCC confident in Dr. Terzian's ability to supervise a junior intern. *Id.*

64. Accordingly, the CCC advanced Dr. Terzian to Probation status due to her deficiencies in the following areas: (1) Medical Knowledge; (2) Systems Based Practice; (3) Interpersonal Communication Skills; and (4) Patient Care. *Id.*

65. The Probation included an Action Plan for each of these categories to provide Dr. Terzian guidance regarding how to improve her performance and be successful. *Id.*

66. Dr. Terzian did not appeal her placement on Probation as allowed by the GME Manual.

67. At no point did Dr. Terzian claim that her placement on Probation was due to any sort of age or gender discrimination.

### Mountainside's Decision to Dismiss Dr. Terzian

68. After being placed on Probation, Dr. Terzian's serious performance deficiencies continued.

69. On April 11, 2022, Dr. Hyokyung Sung, M.D. issued a negative performance evaluation regarding Dr. Terzian's performance, indicating she did not process information provided to her, did not accurately record patient information, had disorganized presenting skills,

was unreliable to do admissions on her own, and did not implement the feedback she received. *See* **Exhibit K**, 4/11/22 Dr. Sung Evaluation.

70. On April 18, 2022, I performed another evaluation of Dr. Terzian. In my evaluation, I noted that Dr. Terzian displayed significant issues with medical decision making in her plan, issues with documentation, had issues recording diagnosis of patients, did not know why certain tests were ordered, and generally continued to struggle with the most basic functions of medical documentation to higher level medical decision making and plan synthesis. *See* **Exhibit L**, 4/18/22 Dr. Berg Evaluation.

71. On April 26, 2022, I received a call from Dr. George informing me that Dr. Anthony was having a very difficult time on the floors with Dr. Terzian. Specifically, Dr Terzian did not complete her notes on time, was confused, and her rounds took an inordinate amount of time to complete. This necessitated assignment of an additional senior resident to the floor to assist with supervision of Dr. Terzian so that patient care and safety would not be compromised.

72. On April 27, 2022, the CCC met regarding Dr. Terzian's recent evaluations. Because Dr. Terzian did not show signs of improvement in her deficient performance areas and actually showed signs of regression, the CCC voted <u>unanimously</u> not to promote Dr. Terzian to PGY2 level.

73. Indeed, the CCC believed that, if permitted to continue with the Family Medicine Program, Dr. Terzian presented a significant and substantial unjustifiable risk to patient health and safety.

**Termination Meeting and Dr. Terzian's Subsequent Resignation/Termination**

74. On May 6, 2022, myself, Dr. George, and MaryBeth Lentine met with Dr. Terzian in my office to inform her that, due to her performance, the CCC could not extend a contract to Dr. Terzian for a second year.

75. I informed Dr. Terzian that she could either resign or be terminated.

76. The decision to offer Dr. Terzian the ability to resign was done in an effort to avoid having a termination decision be placed on Dr. Terzian's record, which would significantly impact her career options in medicine.

77. During the meeting, despite my recommendation that she speak with her family about her decision, Dr. Terzian submitted her resignation.

78. At no time during the meeting did Dr. Terzian claim that her termination was due to any sort of age or gender discrimination.

79. Following the meeting, Dr. Terzian sent me and Nicole Williams, Senior HR Business Partner, an email rescinding her resignation.

80. Just a few hours later, Dr. Terzian sent another email resubmitting her resignation effective May 6, 2022.

81. On June 7, 2022, at the request of Dr. Terzian and her counsel, I sent a letter to Dr. Terzian informing her that her resignation had been rescinded and her status was changed to a termination that would be reflected in her records. *See* **Exhibit M**, 6/7/22 Letter to Dr. Terzian.

82. I also acknowledged that the Appeal Process had been invoked and that we would await further word from the Mountainside's GME Office regarding the dates of the Appeals Board meeting.

83. At no time following my meeting with Dr. Terzian did she indicate to me that her

termination was due to any sort of age or gender discrimination.

84. My presentation to the Appeal Board focused strictly upon the foregoing performance deficiencies.

85. I categorically deny Dr. Terzian's offensive allegations that I ever subjected her to discrimination based upon her age or gender or any other reason except her performance. The residency program is comprised of numerous women and recently graduated a resident who was more than fifty years old.

86. At no point during the entirety of her residency did Dr. Terzian complain to me about any sort of age or gender discrimination.

87. Dr. Terzian's separation was strictly a product of her performance failures and deficient clinical competencies, as the other physicians on the CCC and Appeals Board agreed.

88. Finally, a new residency class has started effective July 1. Returning Dr. Terzian to the medical residency program as a PGY-1 (intern) would be an undue imposition and may not be possible because the number of residents in a class year is "ordained" by the Accreditation Council for Graduate Medical Education (ACGME) and returning Dr. Terzian to start over as a PGY-1 intern would require ACGME approval.

89. Nor can we safely return Dr. Terzian to the medical residency program as a PGY-2 because, as the CCC unanimously found and the Appeals Board agreed, she does not demonstrate clinical competencies permitting her to progress to PGY 2 level of training.

90. If permitted to return to the Family Medicine Residency Program, I believe Dr. Terzian would present a significant and substantial unjustifiable risk to patient health and safety. Therefore, I most respectfully urge the Court to deny her motion.

I declare under penalty of perjury that the above is true and correct, and that I executed this declaration this 29th day of July 2022 in the State of New Jersey.

_____
Kevin J. Berg, M.D., FAAFP